**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JANE DOE,

*Plaintiff,*

-against-

AMAZON.COM SERVICES LLC,

*Defendant.*

Civil Action No. 26-cv-7912 (___)

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Jane Doe ("Plaintiff"), by and through her attorneys, Sutton Sachs Meyer PLLC, as and for her Complaint against Defendant Amazon.com Services LLC ("Amazon" or "Defendant"), alleges as follows, upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1. This action arises from a calculated, retaliatory campaign by Amazon to terminate Plaintiff, a senior executive, following her attempt to change teams, her disclosure of her medical conditions, and her exercise of protected medical leave under the Family and Medical Leave Act ("FMLA") and the Americans with Disabilities Act ("ADA").

2. After Plaintiff informed her manager of her intention to change teams, he retaliated by placing her on a "Focus" performance plan specifically to block her transfer. When Plaintiff complained about this discriminatory performance management, her manager unjustifiably extended the Focus plan. This retaliatory campaign continued to escalate after Plaintiff disclosed her medical conditions and took protected medical leave, ultimately culminating in Amazon weaponizing a routine, innocuous action (viewing a two-year-old internal wiki page) into a fabricated "security violation" to justify her termination and mask its unlawful motives.

3. Plaintiff brings this action to remedy Amazon's unlawful conduct under Title VII of the Civil Rights Act of 1964 ("Title VII"), the ADA, the FMLA, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's federal claims under Title VII, the ADA, and the FMLA pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 2000e-5(f)(3), 42 U.S.C. § 12117(a), and 29 U.S.C. § 2617(a)(2).

5. The Court has supplemental jurisdiction over Plaintiff's related State and City law claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment practices alleged were committed in this District, where Plaintiff was employed.

## PROCEDURAL PREREQUISITES

7. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 520-2026-03068, upon which this Complaint is based, on January 28, 2026.

8. The EEOC issued Plaintiff a Notice of Right to Sue on July 24, 2026. (Exhibit F hereto.)

9. Plaintiff has commenced this action within ninety days of her receipt of the Notice of Right to Sue.

10.

## THE PARTIES

11. Plaintiff is a female individual who resided in New York at all relevant times. Amazon hired her as a Principal Product Manager, Technical ("PM-T") at Level 7 ("L7") effective June 10, 2024. (Exhibit A hereto, at DOE_001.) Notwithstanding the effective date stated in the offer letter, Plaintiff began her employment on May 28, 2024.

12. Plaintiff brings this action under the pseudonym "Jane Doe." She has moved contemporaneously for leave to proceed under that pseudonym. Plaintiff's true name is known to Defendant, which employed her and responded to her EEOC charge, and has been provided to the Court under seal.

13. Defendant Amazon.com Services LLC is a Delaware limited liability company registered to do business in New York, which operates in New York and throughout the United States, and was at all relevant times Plaintiff's employer within the meaning of Title VII, the ADA, the FMLA, the NYSHRL, and the NYCHRL.

14. The exhibits annexed hereto are incorporated in this Complaint for all purposes pursuant to Fed. R. Civ. P. 10(c). They are filed with Plaintiff's name and contact information redacted, with unredacted copies submitted to the Court under seal.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A. Initial Employment, Reorganization, and Diminution of Duties

15. Amazon hired Plaintiff on May 28, 2024, as an L7 Principal PM-T, with a base salary of $230,000 and substantial sign-on bonuses, paid monthly on top of her regular salary, of $297,000 for her first year and $225,500 for her second year. (Exhibit A hereto.)

16. Shortly after Plaintiff was hired, a reorganization under Vice President Ruslana Zbagerska stripped Plaintiff's manager, George Aspland, of his active product portfolio.

17. As a result, Amazon transitioned Plaintiff's strategic L7 projects to other teams. Rather than receiving L7-level work, Plaintiff was directed to assume lower-band (Level 6) responsibilities including, inter alia, launching a project known as the "KPI Bar" following another employee's departure.

18. Consistent with Amazon policy, which allows employees to attempt to transition to other internal roles after three months of tenure, Plaintiff began exploring other roles in September 2024, her three-month anniversary.

19. In October 2024, after discovering that Plaintiff was exploring other roles, Mr. Aspland accused Plaintiff of disloyalty and confronted her about her interviews.

20. Plaintiff responded that she was disappointed and was not being challenged by the lower-band L6 responsibilities she had been assigned.

21. It was also during this timeframe that Plaintiff informed Mr. Aspland about a severe campaign of online harassment directed at her by stalkers utilizing Amazon's own AWS infrastructure, as well as an unauthenticated letter attributed to Meta containing fabricated accusations. Plaintiff explained the acrimonious nature of this campaign and explicitly disclosed to Mr. Aspland her ongoing medical conditions and the profound toll the harassment was taking on her mental and emotional well-being since early 2024.

22. Mr. Aspland took Plaintiff's desire to change teams as a personal slight and a threat to his position. In retaliation, he immediately made plans to move her to a "Focus" performance improvement plan on October 30, 2024, under the pretext of performance issues. This was significant because, under Amazon policy, employees on "Focus" status are not eligible to transition to other internal roles, and the placement doomed Plaintiff's professional goals.

23. Mr. Aspland took this action at the same time Amazon publicly announced that certain managerial positions, including potentially his own, were going to be phased out in 2026. In real terms, this meant that had Plaintiff been allowed to transition to a different role, the reduction in his supervisee headcount would count against Mr. Aspland, placing him at a greater risk of termination in 2026.

B. Protected Activity and Retaliation

24. On or about November 9, 2024, Plaintiff availed herself of bereavement leave following the death of a close family member.

25. To substantiate his claims of poor performance, in November 2024 Mr. Aspland specifically reached out to Plaintiff's peers and solicited negative feedback.

26. One of those peers, Mr. Palileo, e-mailed and texted Plaintiff about Mr. Aspland's solicitation of negative feedback.

27. Unbeknownst to Plaintiff, Mr. Aspland had previously covertly placed Plaintiff on a "Focus" plan on October 30, 2024, immediately after learning of her intent to change teams and prior to her bereavement leave. Under Amazon's notoriously discreet performance management practices, focus plans are rarely announced to employees; rather, employees are left to deduce their placement from a sudden influx of targeted task lists and rigid deadlines.

28. Upon her return from bereavement leave on or around November 18, 2024, Plaintiff was subjected to exactly this: she was given a highly targeted list of tasks to complete and was suddenly required to attend weekly one-on-one meetings with Mr. Aspland to monitor her performance. While Plaintiff recognized these hallmarks and knew she had been placed on Focus, Mr. Aspland concealed her status and did not formally admit to it until Plaintiff directly confronted him in December 2024.

29. Despite having initiated the Focus plan, which was ostensibly designed to provide coaching and support to employees, Mr. Aspland completely disengaged from Plaintiff's development from the very beginning.

30. Mr. Aspland refused to engage in the referenced one-on-one meetings, cancelling four of the six meetings scheduled between November 19, 2024 and December 31, 2024.

31. Plaintiff fulfilled her obligations and consistently provided weekly written updates concerning her progress on her Focus tasks, including logs tracking the progress of each task and the hours contributed. Mr. Aspland never reviewed these updates or considered Plaintiff's documented success, improvements, and milestones.

32. Contrary to the processes and procedures associated with the Focus plan, the goal of which is to help employees meet performance benchmarks through coaching and feedback, Plaintiff received no feedback on any deliverable during November and December 2024.

33. In early January 2025, Plaintiff reported this targeted behavior, and Mr. Aspland's refusal to assist or coach her, to Human Resources.

34. Plaintiff highlighted the fact that on Amazon's internal performance management portal, FORTE, nearly all of her colleagues had provided very positive written feedback and reviews. These colleagues included Charles Gao, Nick Ortega, Ritu Tak, Diederik Van Houten, Santiago Melo, and Mr. Palileo.

35. Plaintiff's documented performance record was stellar. Immediately after her report to Human Resources, Amazon extended Plaintiff's Focus plan indefinitely, contrary to Amazon's processes and procedures governing Focus assessments. Mr. Aspland did not provide Plaintiff with any feedback, let alone negative feedback, in the weeks following this extension.

36. Mr. Aspland's pretextual assertions of Plaintiff's poor performance are belied by her actual performance during all relevant times. While asserting that Plaintiff's performance was deficient, Amazon simultaneously assigned Plaintiff to lead the Unified Campaign Manager initiative, a high-visibility, high-priority goal tied to CEO Andy Jassy's stated organizational objectives. Assignments like these are not bestowed upon poorly performing L7 employees.

37. Plaintiff received strong performance feedback from senior partner-team members, including Gurkaran Sian (L7 Product Manager), Alan Kundargi (L7 Manager), and Pankaj Mall (L7 TPM), among others. This contemporaneous peer feedback reflects an employee performing at level, and not one warranting Focus, an extended Focus, or a PIP.

38. The stark contrast between Mr. Aspland's narrative and the overwhelmingly positive assessments of Plaintiff's peers and other supervisors underscores that the actions taken against Plaintiff were pretextual and manufactured by a single interested actor.

39. In or around March 2025, Plaintiff informed Mr. Aspland of her continued and escalating medical conditions and informed him of her intention to avail herself of protected medical and FMLA leave.

40. Immediately thereafter, Amazon escalated Plaintiff from Focus to a Performance Improvement Plan ("PIP" or "Pivot"), citing a pretextual delay in the "Targeting Cards" project and alleging that it resulted in "missed revenue."

41. Mr. Aspland asserted that this adverse action was a direct result of Plaintiff's alleged failure to launch Targeting Cards in the first quarter of 2025, which he claimed resulted in a missed revenue target.

42. This justification was pretextual. Any delay was not attributable to Plaintiff. The project was blocked by a lack of UX context-string writing capacity, an issue that Plaintiff raised as early as February 2025 in connection with requesting additional resources for the project.

43. At the time, Amazon had deprioritized this work in favor of the Unified Campaign Manager project to which Plaintiff had been assigned. This resulted in a lack of UX or UX-writer support allocated to the project, and it was the actual reason for the delay. This is well documented within Amazon's Weekly Business Reviews of February 2025.

44. Notwithstanding the truth, this delay was the primary reason Amazon escalated Plaintiff into Pivot, at which point she was given the Hobson's choice of either termination with one month's severance or reverting to a PIP. This rationale is contradicted by the actual project timeline and execution. The Targeting Cards feature launched on or around April 14, 2025, only days after Plaintiff's departure for medical leave on or around March 26, 2025 (FMLA leave began on May 24, 2025), with the substantive product work already completed. Plaintiff's actual work on Targeting Cards belies all of Amazon's pretextual justifications for the adverse employment actions taken.

45. Even more significantly, at launch and thereafter (at least through October 2025), no revenue targets were ever assigned to Targeting Cards. Amazon's assertion of a missed revenue target as a sign of a performance issue is, by definition, pretextual.

C. <u>FMLA Leave and Harassment</u>

46. Due to her deteriorating health, including clinically diagnosed anxiety and depression, escalating panic attacks, chronic insomnia, and stress-related physical symptoms that required treatment or a reasonable accommodation, Plaintiff availed herself of protected medical leave in March 2025, and later FMLA medical leave for approximately four months, from May 24, 2025 to September 2025.

47. During this period, Plaintiff was targeted by a severe harassment and defamation campaign by the bad actors she had previously reported to Mr. Aspland in or around October 2024. The defamatory content was hosted on Amazon's own AWS infrastructure. (Captures of the website are submitted to the Court under seal as the first exhibit to the Declaration of Jane Doe filed with Plaintiff's motion for leave to proceed under a pseudonym.)

48. Between July 15 and July 24, 2025, Plaintiff reported this grotesque harassment to Amazon's legal team, explicitly disclosing that the harassment was making her suicidal.

49. Human Resources Partner Samantha Popper responded on July 24, 2025, providing standard "wellness resources." (Exhibit B hereto.) While Amazon eventually issued a narrow notice requiring the harasser to remove certain copyrighted photographs belonging to Plaintiff, it refused to take down the substantive harassing and defamatory content because the bad actor was a paying AWS customer.

50. Concurrently, while Plaintiff was on protected FMLA leave, Mr. Aspland impermissibly interviewed and hired a lower-level male replacement, Jitesh Shah, effectively restructuring her role, giving all her work to the new incoming Product Manager, and stripping her of her position prior to her return.

D. <u>Plaintiff Returns from Leave and the Resulting Pretextual Discrimination</u>

51. Plaintiff returned from FMLA leave on September 29, 2025.

52. Upon her return, Amazon deliberately excluded her from all team meetings, standups, and one-on-one meetings with management for an entire week, assigned her no work, and ignored or refused her when she asked Mr. Aspland and others for work.

53. Plaintiff reached out to Ms. Popper, who immediately asked whether she was taking the one-month severance or electing to remain and improve her performance.

54. Plaintiff highlighted that the tasks on the PIP were no longer valid, as most of them had been completed in her absence. Amazon thus made it impossible for Plaintiff to meet her benchmarks by unilaterally taking them away.

55. Plaintiff repeatedly asked for an updated PIP for seven to ten days after her return. In response, Mr. Aspland and Ms. Popper continued to insist that Plaintiff resign while offering her one month's severance. During this time, Amazon continued to refuse to update her PIP. After repeated requests, on October 6, 2025, Amazon finally issued an updated PIP.

56. The very next day, October 7, 2025, Amazon's Enterprise Protection Program ("EPP") erroneously flagged Plaintiff for an alleged unauthorized data transfer. Amazon asserted that Plaintiff had sent a document (Sponsored ASIN Readiness) to herself or had otherwise downloaded the document in an unauthorized manner.

57. The document in question was a two-year-old deprecated internal wiki page that Plaintiff herself had previously been tasked to revise, supplement, and update. Plaintiff's highly technical duties often required her to consult technical manuals and other internal resources whose purpose was to apprise employees of relevant data, technical specifications, policies, and procedures.

58. This document stated: "Last modified 2 years ago by kravitz." It detailed publicly observable machine-learning features (e.g., product title, review rating) using an open-source methodology entitled XGBoost, and contained no trade secrets, confidential information, or sensitive data.

59. On October 7, 2025, Amazon revoked Plaintiff's access to its systems, locking her out before she could ask for clarification about her new PIP. (Exhibit C hereto.)

60. Again, this occurred immediately after Plaintiff had engaged in protected activity.

61. Plaintiff received no email and no communication from anyone at Amazon about her lockout.

E. Bad-Faith Investigation and Termination

62. Plaintiff immediately reached out to Ms. Popper to ask why she had been locked out.

63. Several days later, Ms. Popper invited Plaintiff to a meeting to discuss a possible security breach.

64. Amazon's investigator alleged that the system had triggered an alert because Plaintiff reviewed and downloaded a document from Amazon's internal knowledge-base system in connection with performing her duties.

65. Plaintiff contemporaneously recorded her meetings with Human Resources and EPP. Those recordings reflect that (a) the EPP investigator acknowledged that the investigation had not substantiated any actual misuse or disclosure of Amazon data, and that (b) during these calls, rather than attempting to investigate and address the substance of the alleged breach, Ms. Popper continuously pressed Plaintiff to take the offered one-month severance and resign.

66. After the call, Plaintiff emailed Ms. Popper that the offer seemed irregular, particularly because the call had been about an investigation into a potential breach, and that it was odd that she was not being guided to improve her performance but was being pressed to take one month's severance. (Exhibit D hereto.)

67. Plaintiff consulted with counsel and declined to sign the "Certificate of Deletion" Amazon had presented, because she had never engaged in any unauthorized activity or accessed or downloaded data she was not entitled to, and signing such an acknowledgement would have been a tacit admission of wrongdoing. Amazon did not make execution of the document a

condition of her continued employment, yet it subsequently cited her refusal as support for her termination.

68. While Amazon asserted that "system-generated detection logs confirmed the transfer," it never identified the mechanism (i.e., whether the alert was the result of, for example, a deliberate upload, a background sync, a clipboard event, or a browser-based WhatsApp Web session open in a tab).

69. Modern data-loss-prevention ("DLP") systems flag a wide range of ambiguous and technically innocent events. Innocuous activity such as having WhatsApp Web open in a browser tab can trigger a false-positive DLP alert.

70. The ambiguity is further substantiated by the fact that, during this time, Mr. Aspland maliciously contaminated the EPP security investigation with information from an unverified letter that Plaintiff had voluntarily shared with him in October 2024, for the sole purpose of getting rid of Plaintiff.

71. Specifically, Mr. Aspland shared a November 2023 document that pre-dated Plaintiff's employment with Amazon and post-dated her employment with Meta, and instructed the investigator that it should be grounds for termination. The letter was an automatically generated cease-and-desist from Plaintiff's prior employer concerning allegations that were never substantiated and that were entirely unrelated to Plaintiff's role and responsibilities at Amazon.

72. That Mr. Aspland went out of his way to create a narrative from information he had been told in confidence, when Plaintiff was in a position of weakness, shows his discriminatory animus.

73. This document related to the online harassment campaign Plaintiff had been experiencing, which she reported to Mr. Aspland in 2024 and to Amazon in July 2025.

74. Crucially, Mr. Aspland intentionally concealed from the investigator that Plaintiff had already explicitly informed him that the referenced document was a product of the harassment campaign she had previously disclosed to him.

75. Tainted by Mr. Aspland's retaliatory animus, the EPP investigation explicitly and unlawfully utilized Plaintiff's protected activity as a "risk factor," citing that she had just returned from a long leave and "remained in her Pivot decision period" to justify termination.

76. Amazon accepted and acted upon the unverified letter as a termination "risk factor" without any independent verification of its substance or provenance.

77. Amazon is therefore liable under a "cat's paw" theory: Mr. Aspland, acting with retaliatory and discriminatory animus, intentionally fed tainted, harasser-generated information into the EPP process while concealing exculpatory context. This conduct proximately caused Plaintiff's termination, and Amazon negligently permitted his tainted input to achieve its intended effect without independent verification.

78. Amazon formally terminated Plaintiff on October 20, 2025, effective October 24, 2025, communicating the termination by email while she was in London attending her grandmother's funeral. (Exhibit E hereto.)

79. Although Amazon did not formally communicate Plaintiff's termination until on or about October 20, 2025, Amazon's internal records will reflect that the decision to terminate Plaintiff had been made on or about October 7, 2025.

80. On or about that date, Amazon disabled Plaintiff's system and building access and, upon information and belief, blacked out Plaintiff's internal Slack profile, an action that, under Amazon's own internal practices, occurs only when an employee has been removed from the system following termination.

81. Multiple colleagues contemporaneously informed Plaintiff that she had been terminated on October 7, 2025, because they saw that her profile had been deleted from the system and they could no longer find her, even though nothing had been formally communicated to her.

82. Notwithstanding that the decision had already been made, Amazon continued for roughly two more weeks to press Plaintiff to accept a one-month severance and sign a global release in exchange, while withholding formal notice of termination.

83. Upon information and belief, Amazon anticipated that Plaintiff would quietly accept severance and resign, mooting any dispute and avoiding any exposure of Amazon's unlawful employment practices.

84. Only when Plaintiff refused to sign the certificate of deletion and signaled her intent to continue her employment did Amazon formalize her termination under the pretext of the alleged security violation.

85. Amazon's decision to terminate Plaintiff for alleged cause, rather than to separate her with the severance it had repeatedly offered, is itself evidence of pretext. Amazon had offered Plaintiff severance in exchange for a release initially in connection with her Pivot and again in October 2025. By manufacturing a for-cause termination premised on a two-year-old, deprecated internal wiki page of no competitive value, Amazon was able to terminate Plaintiff without severance.

86. That Amazon chose to brand routine conduct as terminable misconduct, conduct it would not have treated as terminable for any other similarly situated employee, rather than pay the severance it had already put on the table, supports the inference that the stated rationale was a pretext for a decision made on unlawful grounds.

F. Comparator Evidence

87. Amazon selectively enforced its data-handling and security policies to target Plaintiff.

88. A similarly situated male comparator, Diederik Van Houten (an L7 Manager), engaged in substantively identical conduct in December 2024 by sending internal Amazon resources and files, including files from the internal wiki, directly from and to his personal device.

89. Unlike Plaintiff, who is Indian, female, had taken FMLA leave, and had complained to Human Resources, Mr. Van Houten faced no immediate lockout, no bad-faith investigation, and no disciplinary action, and Amazon actively refused to investigate his data-transfer logs.

90. Additionally, after her termination, in preparing her EEOC submission in January 2026, Plaintiff obtained the complete version of the wiki page from a former male Amazon colleague, Santiago Melo, who downloaded and exported the exact same file without being terminated by Amazon.

91. This is the second instance of a male L7 Product Manager facing no immediate lockout, no bad-faith investigation, and no disciplinary action from Amazon for the same conduct in which Plaintiff is alleged to have engaged.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Disability Discrimination and Failure to Accommodate in Violation of the ADA, 42 U.S.C. § 12101 et seq.)**

92. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

93. Plaintiff was a qualified individual with a disclosed disability within the meaning of the ADA.

94. Amazon failed to engage in the interactive process. Instead of accommodating Plaintiff, Amazon used her bereavement and medical leaves as opportunities to build a pretextual performance case and restructure her role.

95. As a result, Plaintiff has been damaged.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Retaliation in Violation of the ADA and Title VII, 42 U.S.C. § 12203 and 42 U.S.C. § 2000e-3(a))**

96. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

97. Plaintiff engaged in protected activity by complaining to Human Resources regarding disparate treatment and lack of coaching, by disclosing her disability, and by requesting and taking medical leave.

98. Amazon retaliated by indefinitely extending her Focus plan, placing her on a baseless Pivot plan, and weaponizing an EPP security flag to terminate her.

99. Amazon is liable under a “cat’s paw” theory of liability: Mr. Aspland acted with retaliatory animus by feeding tainted, harasser-generated documents to the EPP investigator while concealing exculpatory context, proximately causing Plaintiff’s termination.

100. As a result, Plaintiff has been damaged.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Interference and Retaliation in Violation of the FMLA, 29 U.S.C. § 2615)**

101. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

102. Amazon interfered with Plaintiff's FMLA rights by hiring a replacement during her leave, failing to restore her to an equivalent position, and completely excluding her from team activities for a week upon her return.

103. Amazon retaliated against Plaintiff for taking FMLA leave. Amazon's EPP investigator listed her recent return from a long leave as a risk factor justifying termination, which constitutes direct documentary evidence of FMLA retaliation.

104. The FMLA entitles an employee returning from leave to restoration to the same or an equivalent position. By assigning Plaintiff no work and excluding her from all team activities for the entire week following her return, Amazon denied Plaintiff that restoration and thereby interfered with her FMLA rights, independent of any retaliatory motive.

105. Upon her return from leave on or about September 29, 2025, Amazon failed to restore Plaintiff to her position or to an equivalent position with equivalent duties, responsibilities, status, and terms of employment. For the entire first week following her return, Amazon assigned Plaintiff no work, excluded her from all team meetings, standups, and one-on-one meetings, and ignored or rebuffed her when she affirmatively asked Mr. Aspland and others for work and sought to re-engage with her team.

106. Plaintiff made repeated, documented efforts during that week to reconnect with colleagues, schedule syncs, and reestablish her workflow. Amazon disregarded those efforts. This complete failure to reinstate Plaintiff to an equivalent position, and the deliberate exclusion of

Plaintiff from every aspect of her role upon her return, constitutes interference with Plaintiff's FMLA rights independent of Amazon's retaliatory and discriminatory conduct.

107. As a result, Plaintiff has been damaged.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Sex Discrimination in Violation of Title VII, 42 U.S.C. § 2000e et seq.)**

108. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

109. Amazon selectively enforced its policies based on sex. A similarly situated male comparator, Mr. Van Houten, engaged in substantively identical conduct but faced no investigation or termination.

110. As a result, Plaintiff has been damaged.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Discrimination and Retaliation in Violation of the NYSHRL, N.Y. Exec. Law § 296 et seq.)**

111. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

112. Amazon's actions satisfy the standards of the NYSHRL: Amazon treated Plaintiff less well because of her disability and sex and because she engaged in protected activity, and its actions would likely deter a person from engaging in protected activity.

113. As a result, Plaintiff has been damaged.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Discrimination and Retaliation in Violation of the NYCHRL, N.Y.C. Admin. Code § 8-107 et seq.)**

114. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

115. Amazon violated the NYCHRL by discriminating and retaliating against Plaintiff based on her sex, her disability, and her protected activities.

116. As a result, Plaintiff has been damaged.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the entry of judgment against Defendant as follows:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by Title VII, the ADA, the FMLA, the NYSHRL, and the NYCHRL by discriminating and retaliating against Plaintiff on the basis of her disability, her sex, and her protected activity;

B. Awarding Plaintiff damages for all lost wages and benefits resulting from Defendant's unlawful conduct, and otherwise making her whole for any losses suffered as a result of such unlawful employment practices, in an amount to be proven at trial;

C. Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering, and injury to her reputation, in an amount to be proven at trial;

D. Awarding Plaintiff liquidated damages under the FMLA and punitive damages under Title VII, the ADA, the NYSHRL, and the NYCHRL;

E. Awarding Plaintiff reasonable attorneys' fees, costs, and disbursements incurred in the prosecution of this action; and

F. Such other and further relief as the Court may deem equitable, just, and proper to remedy Defendant's unlawful employment practices.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
September 10, 2026

SUTTON SACHS MEYER PLLC

By: ______________________________

Ali R. Jaffery, Esq.
Attorneys for Plaintiff
125 Park Avenue, 25th Floor
New York, New York 10017
(212) 480-4357
ali@ssm.law

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JANE DOE,

*Plaintiff,*

-against-

AMAZON.COM SERVICES LLC,

*Defendant.*

Civil Action No. 26-cv-________ (___)

**SCHEDULE OF EXHIBITS**

| | |
|---|---|
| Exhibit A | Offer letter from Amazon.com Services LLC to Plaintiff dated May 6, 2024 (DOE_054 to DOE_066) |
| Exhibit B | Email from Samantha Popper, Amazon HR Partner, to Plaintiff dated July 24, 2025, “Resources for Wellbeing and Mental Health” (DOE_084) |
| Exhibit C | Email thread between Plaintiff and Samantha Popper dated October 7, 2025, “Unable to access office and the email” (DOE_045 to DOE_046) |
| Exhibit D | Email thread between Plaintiff and Samantha Popper dated October 15 to 16, 2025, “Regarding the certification of deletion” (DOE_047 to DOE_048) |
| Exhibit E | Email thread between Samantha Popper and Plaintiff dated October 17 to 20, 2025, “[Confidential] HR Meeting - Investigation Update,” including Amazon’s October 20, 2025 notice of termination (DOE_031 to DOE_034; privileged communication removed) |
| Exhibit F | EEOC Notice of Right to Sue, Charge No. 520-2026-03068, issued July 24, 2026 |

Each exhibit is filed with Plaintiff’s name, contact information, and Bates prefix redacted.

Unredacted copies are submitted to the Court under seal with Plaintiff’s letter-motion to seal.